UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USA,<br><br>              Plaintiff,<br><br>    v.<br><br>DERECK ARDIS,<br><br>              Defendant. | Case No. 22-cr-00462-SI-1<br><br>**ORDER GRANTING DEFENDANT'S REQUEST FOR A *FRANKS* EVIDENTIARY HEARING**<br><br>Re: Dkt. No. 47 |

Defendant Dereck Ardis moves to suppress evidence seized from his backpack and girlfriend's residence on October 7, 2022. Dkt. No. 47. Alternatively, Ardis seeks an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978) regarding the validity of the underlying search and arrest warrant affidavits. *Id.* The government opposes. Dkt. No. 56. Having carefully considered the parties' arguments and all submitted evidence, including extensive surveillance footage, the Court hereby GRANTS defendant's request for a *Franks* evidentiary hearing.

The June 21, 2024 hearing on defendant's motion to suppress and request for an evidentiary hearing is vacated. The Court directs the parties to meet and confer regarding the date for the evidentiary hearing, and then to contact the Court's courtroom deputy, Ms. Chung, regarding scheduling.

**DISCUSSION**

A criminal defendant may challenge a facially valid search warrant affidavit by showing that (1) a false statement was, knowingly and intentionally or with reckless disregard for the truth,

included in the warrant affidavit, and (2) that the allegedly false statement was necessary to the finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *United States v. Putney*, 906 F.2d 477, 478 (9th Cir. 1990). Deliberate or reckless omissions of facts from the affidavit that tend to mislead can also constitute a *Franks* violation. *United States v. Dozier*, 844 F.2d 701, 705 (9th Cir. 1988) (citing *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir.), *amended*, 769 F.2d 1410 (9th Cir. 1985). A non-conclusory "substantial preliminary showing" of these facts entitles the defendant to an evidentiary hearing. *Franks*, 438 U.S. at 170-71. "Clear proof of deliberate or reckless omission is not required"; at the pleading stage "all that is required is that the defendant make a substantial showing that the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading." *Stanert*, 762 F.2d at 781. The most commonsense evidence that officers acted with at least a reckless disregard for the truth is that the alleged omissions or false statements contained in the affidavit were facts within the officer's personal knowledge. *Chism v. Washington State*, 661 F.3d 380, 388 (9th Cir. 2011). A defendant is not entitled to a *Franks* hearing if, setting aside the alleged misstatements, "there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Franks*, 438 U.S. at 171-72; *see also Chism*, 661 F.3d at 389 (quoting *Stanert*, 762 F.2d at 782) (Alleged false statements and omissions in an affidavit are material if "'the affidavit, once corrected and supplemented,' would not have provided a magistrate judge with a substantial basis for finding probable cause.").

Ardis indicates that the heart of his argument is a *Franks* challenge to each affidavit because in each, "SFPD misrepresented some piece (or pieces) of key evidence . . . and omitted key evidence that the judges should have known." Dkt. No. 47 at 2; *see also* Dkt. No. 70 at 1. The government responds that Ardis "has not met his burden of showing that Lee made any intentionally or recklessly false or misleading statements or omissions, let alone that any of the allegedly false or misleading statements or omissions in the affidavits were material." *Id.* at 20-21.

The warrant affidavits Ardis challenges were all authored by San Francisco Police Department Inspector Lee and are all based on the same underlying facts.

**I.     The August 22, 2022 GPS Tracking Warrant**

Ardis contends that for both the GPS tracking warrant and the Cell Site Location Information ("CSLI") warrant, the affiant, Inspector Lee, did not include any "contradictory details" of the crime scene investigation the morning of Landry's death, nor cite surveillance video footage that did not align with Hopkins's story. Dkt. No. 47 at 12-13. Ardis contends that the affiant purported to credit Hopkins's story through surveillance footage, but the footage "was cherry-picked and contradictory footage was ignored." *Id.* at 14.

Ardis points to the following surveillance footage not presented to the magistrate that he contends contradicts Hopkins's story: Hopkins is not depicted getting into the silver SUV in the 1188 Wallace Avenue surveillance footage between 2:26am and 2:38am; this surveillance footage does not record any flash or light burst; a man referred to by Ardis as "two-toned pants man" is seen walking normally near Landry's tent while the SUV is parked there; Hopkins was walking around the Mother Brown's complex between 1:40 and 2:00am, not asleep in Landry's tent as she claimed; and Hopkins was walking around in the 4:00am hour, after she stated she had gone to sleep. Dkt. No. 47 at 15-18, 42, 46-47. Ardis contends that the affidavit also omits the following "important details" of the crime scene investigation: that there were no ShotSpotter activations or reports of shots fired in the relevant time frame; no shell casings or bullet rounds were found near or in the tent nor in Landry's body; the trajectory of the entry and exit wounds "suggested a nearly vertical shot downward"; and no holes were located in the back or floor of Landry's tent. *Id.* at 18-19, 46. Ardis also contends that the affidavit omitted any mention of Hopkins's domestic violence history with Landry, which was included in an August 22, 2022 search warrant affidavit for a search of Hopkins and Landry's tents. *Id.* at 46; *see* Ex. V[1] (search warrant for tents).

The government contends that the fact that the surveillance video footage does not appear to capture a gunshot flash or Hopkins entry into the SUV does not negate probable cause. Dkt. No. 56 at 24. On the current record, the Court agrees that this is not a misleading omission because the surveillance footage does not capture the full time the SUV was in front of Landry's tent. The Court

---

[1] All letter exhibits are attached to the Falk Declaration at Dkt. No. 42. All numerical exhibits are attached to the Davidson Declaration at Dkt. No. 56-1.

3

also agrees with the government that the affiant's failure to mention the history of alleged domestic violence incidents between Hopkins and Landry is not a misleading omission because sufficient information about Hopkins's relationship with Landry was presented in the affidavit. Ardis contends that the behavior of two-toned pants man is inconsistent with the behavior of someone who witnessed a shooting and should have been presented to the magistrate. *See* Dkt. No. 47 at 40-41. On the current record, the Court does not find this to be a misleading omission because the footage of two-toned pants man around the area of Landry's tent at the time Hopkins said the shooting occurred does not show Landry's tent or the silver SUV, and two-toned pants man is not on screen the full duration of time the SUV is outside of Landry's tent.

Ardis also contends that the affiant's descriptions of some of the videos and images involving the vehicle do not accurately represent what the affidavit claims. Dkt. No. 47 at 20. Ardis specifically points to the following. First, the affiant claims that at about 2:38am a vehicle that "appears to be an Infiniti SUV" drives away from the curb on Wallace Avenue, citing Wallace Avenue Channel 2 footage. Ex. R at 8.[2] The Court has reviewed the Channel 2 footage multiple times; it is very dark and blurry and the only things the Court can clearly make out are the vehicle's general shape and that it has four headlights on when it pulls up to the curb. There is also Channel 5 footage from Wallace Avenue that briefly shows the vehicle before it goes out of screen. This footage is much clearer and it is reasonable to say based on this footage that the vehicle could be an Infiniti SUV. It is also clear that the Channel 11 and Channel 2 footage is of the same vehicle given the timeline and way the vehicle backs up before pulling forward. All facts "necessary to show probable cause for the issuance of a search warrant must be contained within the four corners" of the affidavit. *U.S. v. Anderson*, 453 F.2d 174, 175 (9th Cir. 1971). The affiant did not refer to the Channel 11 footage in the affidavit, but the Court does not find that this causes the statement about the vehicle in the affidavit to be false or misleading. Second, Ardis takes issue with the statement in the affidavit that Officer Rashidian "later located surveillance footage of the Infiniti SUV on 3rd St. and Palou Ave. in a time frame consistent with the vehicle's travel to US Bank . . . The vehicle

---

[2] All exhibit page numbers refer to the ECF page numbers.

is clearly recognizable as an Infiniti SUV with large diameter, after-market rims." Ex. R at 8. The crime bulletin states that the vehicle "appears to be an Infiniti SUV Crossover with aftermarket wheels." Ex. P. "Clearly recognizable" may be a stretch, but the Court does not find that this rises to the level of a false or misleading statement.

However, the Court does find that defendant has made a substantial preliminary showing that the following omissions warrant a *Franks* evidentiary hearing. The affidavit does not include the fact that surveillance footage contradicts several aspects of Hopkins's story, specifically her assertions that she fell asleep in Landry's tent while watching the Malcolm X movie and didn't wake until 2am, and that she went back to her tent and slept until the police detained her shortly after being dropped off at Mother Brown's. Witness Bradford's statements also contradict her story because Bradford indicates he last saw Landry at 2am on August 22, 2022 but last saw Hopkins between 11am and 12pm on August 21, 2022. The Court also finds that a substantial preliminary showing that the omission of crime scene investigation information was misleading, including that there were no ShotSpotter activations or reports of shots fired in the relevant time frame, given the amount of time investigators spent inspecting Landry's tent and the fact that this investigation tends to cast doubt on aspects of Hopkins's story.[3] These omissions could be misleading, particularly given that Hopkins's story is the only thing connecting the silver SUV in the surveillance footage to a shooting and all these details cast doubt on the veracity of her story. The government does not address the inconsistencies between the surveillance footage and Hopkins's story in its opposition. *See* Dkt. No. 56 at 22-30.

The government contends that there is no showing that any misleading omissions were made intentionally or recklessly. Dkt. No. 56 at 32-33. The Court disagrees; the alleged omissions were within the officer's personal knowledge, which is the most "commonsense evidence" that an officer acted with at least a reckless disregard for the truth. *See Chism*, 661 F.3d at 388. Furthermore, the

---

[3] Inspector Lee states in his declaration submitted with the government's opposition that in his training and experience "ShotSpotter, while often reliable, may not have a hundred percent accuracy rate . . . It is also possible that ShotSpotter may not detect gunfire noise, based on a variety of factors." Lee Decl. ¶ 25. These things may be "possible," but the Court still finds this omission could be misleading given the representations about the ShotSpotter technology in the ShotSpotter Technology Policy and Impact Report. *See* Ex. KK.

5

government included a declaration from Inspector Lee along with its opposition that does not address some of the above-identified omissions or addresses them in a conclusory fashion. The government also argues in a conclusory manner that even if the Court were to find the first *Franks* prong met, Ardis has not shown that any of the allegedly misleading statements were necessary to find probable cause. Dkt. No. 56 at 33. The Court disagrees. Hopkins's story is the only thing connecting the silver SUV "D" was driving to a shooting, so evidence that throws into doubt aspects of her story is highly relevant and should have been considered in the probable cause determinations, which already relied on thin evidence.

## II.     The September 2, 2022 Cell Site Location Information ("CSLI") Warrant

In addition to the challenges discussed under the GPS tracking warrant that also apply to the CSLI warrant, Ardis points to the following "false" statement: that an officer "obtained surveillance footage from the areas of 3rd St and Quesada Ave. We were able to view blurred images of the Infiniti SUV with the license plate of CA/5NUW413." Ex. B. at 9. The Court has reviewed the relevant surveillance videos. The license plate of the SUV in not visible in any of the surveillance footage.

The government responds that this challenged statement is not false or misleading because when "read as a whole, the affidavit describes how law enforcement identified the light-colored Infiniti SUV with large diameter after-market rims in the 3rd and Quesada footage as the same SUV outside the defendant's residence" but "does not state that SFPD could read the license plate number from the surveillance footage." Dkt. No. 56 at 37. This is a strained reading of the affidavit. The affidavit reads as saying that the silver SUV in the 3rd and Quesada surveillance footage has the license plate number of Ardis's SUV.[4] However, the license plate number of the SUV in the surveillance footage is not visible; it is just a reasonable guess that the SUV in the surveillance footage *could* be Ardis's SUV because of the visual similarities between the vehicles. Thus, there

---

[4] The September 27, 2022 arrest warrant affidavit includes the statement: "Ardis's silver, Infiniti SUV was captured on video traveling on 3rd St, driving to and stopping at US Bank, as described by Hopkins." Ex. C at 12. This implies that the SUV in the 3rd and Palou surveillance footage is identifiable as Ardis's SUV with near certainty; ie., that the license plate is visible.

6

has been a substantial preliminary showing that this statement was recklessly made and material because it purports to directly tie Ardis's vehicle to transporting Hopkins to U.S. Bank, and is the only part of the affidavit that ties Ardis's vehicle to Hopkins's story. Inspector Lee does not address this statement in his declaration submitted with the government's opposition.

### III.     The September 27, 2022 Arrest Warrant and Jamestown Search Warrant

The challenges raised with respect to the previous two warrants are incorporated here. Ardis further contends that the following statements relating to when Hopkins was shown additional photos and video of Artis are misleading. The affidavits state: "I asked her if she recognized the male. Hopkins stated she did not"; and "Hopkins reviewed the video clips and stated that they were of the same male in the images, but she did not recognize him." Ex. C at 9. Ardis contends these statements are misleading because Hopkins specifically states "no, that ain't him" when shown photographs of Ardis from the morning of August 22, 2022 and when shown videos of Ardis. Dkt. No. 47 at 24. The government contends that the statement that Hopkins "does not recognize" Ardis conveys the same meaning as "it's not him." Dkt. No. 56 at 38-39. The Court disagrees; Hopkins stating she does not recognize the man in photos/video of Ardis is more ambiguous and open to interpretation than repeated statements Ardis is not D.

Ardis also contends that Inspector Lee's interpretation of the CSLI data is "erroneous in places and misleading." Dkt. No. 47 at 24. Ardis submits a declaration from Joshua Michel, Senior Forensic Examiner at Roloff Digital Forensics, LLC, who reviewed the September 27, 2022 warrant of Inspector Lee. *See* Dkt. No. 44 ("Michel Decl.") ¶¶ 1, 3. Michel notes several problems with the visualizations in the warrant. *See id.* Regarding the first visualization, Ardis contends that the only "conclusion that appears to be properly drawn" is that Ardis's cell phone was pinging somewhere within the angle of the identified sector in the Bayview district at 2:27am, which is not surprising considering that the Jamestown residence is also in the Bayview district. Dkt. No. 47 at 25. With respect to the second and third visualizations, which purportedly demonstrate movement of Ardis's cell phone towards U.S. Bank, Michel could not find a corresponding T-Mobile data point for the first circle, and absent that first circle, Ardis contends that the affidavit's depiction of the cell phone

7

1    moving towards U.S. Bank falls apart. Dkt. No. 47 at 25; Michel Decl. ¶ 12. Inspector Lee declares
2    in his declaration submitted with the government's opposition that his inclusion of a reference to a
3    data point at 2:41:25am was a typographical error and the data point he intended to reference was
4    2:40:25am. Lee Decl. ¶ 26. The government's expert states that he "was easily able to locate a
5    2:40:25 AM cellular event" and noted that "the cell site location to be the same." Dkt. No. 56-6
6    ("Sonnendecker Decl.") ¶ 12. The Court does not find this apparent typographical error to be a
7    material omission.
8          "Most troublingly," Ardis contends that the affidavit ignores and omits a "highly relevant
9    data point"—an incoming phone call that connects with Ardis's cell phone at 2:36am and lasts for
10   15 minutes. Dkt. No. 47 at 25; *see* Michel Decl. ¶¶ 13-14. According to Michel, this call does not
11   "hand off" or transfer to another cell site. *Id.* ¶ 13. Ardis contends that this suggests that the cell
12   phone user was either stationary or moving solely within the original cell site receptor during the
13   15-minute period, which "conflicts with the conclusion" in the affidavit that the cell phone user
14   drove north to U.S. Bank and casts doubt on the likelihood that Ardis was the shooter described by
15   Hopkins. Dkt. No. 47 at 26, 52. This data is not mentioned in the affidavit and Ardis contends that
16   at the time the warrant was issued, all these data points were known to the affiant. *Id.* at 52.
17   Inspector Lee states in his declaration submitted with the government's opposition that he was "not
18   aware of this data point" at the time he submitted these warrants, and that even if he had been aware,
19   his view of Ardis's "involvement in the crime would not have changed." Lee Decl. ¶ 27. Inspector
20   Lee does not explain these statements, although he appears to have fully engaged with the data to
21   map it in the warrant affidavits.
22         The government responds that "[i]f anything, the information about the phone call actually
23   supports probable cause." Dkt. No. 56 at 45. The government submits a declaration from Mark
24   Sonnendecker, Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives
25   "tasked with managing a national cellular analytics program" who reviewed the arrest warrant
26   authored by Inspector Lee and the Michel declaration. Sonnendecker Decl. ¶¶ 1, 3. Sonnendecker
27   states that "calls carried on the T-Mobile LTE (4G) cellular network do not have the ending cell
28   site/sector information provided in the call detail records" and in his review of 1,896 rows of data,

8

there were "zero (0) instances of an ending cell site/sector being provided in these records." *Id.* ¶ 16. Thus, according to Sonnendecker, "one cannot determine if the call was carried in its entirety on this cell site/sector with the call detail records alone." *Id.* Sonnendecker goes on to "further analyze the possibility of the entirety of this call occurring on this cell site/sector" by looking at cellular activity from the "timing advance file." *Id.* ¶ 17.[5] He "noted numerous timing advance events that occurred to the north/northeast of the cell site/sector from where the call initiated, then to an area to the south of the same cell site/sector." *Id.* He asserts that "this data supports the fact that the entirety of the call did not occur on the same cell site/sector." *Id.*

The Court finds that defendant has made a substantial preliminary showing that the omission of this 15-minute phone call was misleading and material, considering that according to Hopkins's story, during the time period of the phone call D and Landry were "arguing," D possibly shot Landry, and D took Hopkins to the bank and dropped her off. It is implausible that D was simultaneously on the phone while all this was happening, although he could have paused and muted the call. Hopkins never indicated in her extensive interview that D was on the phone.

Ardis also contends that the cell data graphics in the warrants were not explained and/or are misleading. Dkt. No. 47 at 33-34, 52. The government disagrees. Dkt. No 56 at 42-43. In his reply, Ardis contends that the use of yellow shading in a "wedge" on a map with defined boundary lines, with a disclaimer that the shading is "only used as contrast for easier viewing" is a misleading way to use cell site location data and the Court should hold an evidentiary hearing on this point to consider what, if anything, the cell site data mapping added to the affidavit. Dkt. No. 70 at 15. The parties may address the visualizations in the affidavits and what they contribute or why they are

---

[5] According to Sonnendecker, "Timing advance records are another type of cellular record that captures a different type of transactional data. These records capture communications between the cellular network and the cellular device. Such data as the date and time, duration, and cell site/sector information are captured in timing advance records. During a timing advance event, the network sends a signal to the handset and then estimates the distance the cellular device is away from the antenna to which the cellular device is communicating based on the time it takes for a signal to travel from the antenna to the cellular device and then back to the antenna. . . T-Mobile provides a distance in miles the network estimated the cellular device to be from a given antenna during a timing advance event in their timing advance file. Analysis of the cell site/sector information from the call detail records along with the timing advance data can aid investigators in identifying a general area a cellular device was during a timeframe of investigative interest." *Id.* ¶ 5.

9

misleading at the evidentiary hearing.

**IT IS SO ORDERED**.

Dated: June 14, 2024

SUSAN ILLSTON
United States District Judge